IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| MICHAEL KNICKERBOCKER<br>and ALEXANDRIA HILL,<br><br>    Plaintiffs,<br><br>v.<br><br>THE UNITED STATES<br>OF AMERICA,<br><br>    Defendant. | )<br>)<br>)<br>)<br>) Case. No.: 3:19-cv-910-RAH-SMD<br>)              [WO]<br>)<br>)<br>)<br>)<br>) |

## **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL ORDER**

This cause is before the Court for the entry of findings of fact and conclusions of law, which this Court makes in accordance with Federal Rule of Civil Procedure 52(a) based on the pleadings, the evidence including the witness testimony and exhibits that were admitted, the arguments and stipulations of counsel, as well as the remainder of the record.

This action arises out of a motor vehicle accident that occurred in Lee County, Alabama on December 3, 2017. Plaintiff Michael Knickerbocker was driving his motorcycle on Lee Road 166 when he was struck by a postal truck driven by Gabrielle Nelson, an employee of the United States Postal Service (USPS). On account of the collision, Knickerbocker filed the instant negligence action against

1

the United States seeking compensation under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 et seq.[1]

The parties have stipulated that on December 3, 2017, Nelson was an employee of the United States, specifically the USPS, and was acting within the line and scope of her employment at the time of the accident. Therefore, the Court accepts that Nelson was a federal employee for purposes of the FTCA.

Pursuant to the FTCA, the United States can be held liable in tort in the same manner and only to the same extent as a private individual under like circumstances. 28 U.S.C. § 2674. In considering claims brought under the FTCA, the Court applies the substantive law of the place where the claim arose. *See id*; *see also Schippers v. United States*, 715 F.3d 879, 887 n.8 (11th Cir. 2013) ("Under the FTCA, the applicable law is the 'whole law of the State where the act or omission occurred[.]'" (citation omitted)). Thus, the substantive law of the State of Alabama applies in this case.

In Alabama, "[t]o establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994). Due to the stipulation of liability by the United States on the claim for negligence, the only

---

[1] Plaintiff Alexandria Hill also filed suit against the United States for damages suffered from this accident. She settled prior to trial.

remaining issue for trial was Knickerbocker's damages stemming from the accident. Some of Knickerbocker's damages claims are contested, while others are not.

In negligence actions under Alabama law, a plaintiff bears the burden of proof to show that the defendant's conduct naturally and probably brought about the plaintiff's harm and that the harm would not have happened without the conduct. *Bobo v. Tennessee Valley Auth.*, No. CV 12-S-1930-NE, 2014 WL 12902423, at *9 (N.D. Ala. Aug. 25, 2014) (citing *2 Alabama Pattern Jury Instructions — Civil* § 33.00 (3d ed. 2013); *Lingefelt v. Int'l Paper Co.*, 57 So. 3d 118, 122–23 (Ala. Civ. App. 2010); *Vines v. Plantation Motor Lodge*, 336 So. 2d 1338, 1339 (Ala. 1976); *City of Mobile v. Havard*, 268 So. 2d 805, 810 (Ala. 1972)).  As the factfinder, the Court is free to determine the reliability and credibility of the witness testimony and expert opinions and to weigh them as it sees fit.  *See* Fed. R. Civ. P. 52(a)(6); *United States v. Brown*, 415 F.3d 1257, 1270 (11th Cir. 2005).

The Court conducted a one-day bench trial on November 7, 2022.  During the trial, Knickerbocker testified on his own behalf and called his stepfather, Steven Counts, as a witness to corroborate his injuries and damages.  Knickerbocker also presented, and the Court received, deposition testimony from Dr. Keith Anderson, a physiatrist, who performed an independent medical examination of Knickerbocker. Additionally, the Court reviewed evidence introduced by the parties, including Knickerbocker's extensive medical records and bills and photographs of the vehicles

at the scene of the accident, as well as Knickerbocker's injuries. After the close of the evidence, the parties filed post-trial briefs.

## I. FINDINGS OF FACT

At the time of the accident, Knickerbocker was 24 years old and employed in the wood flooring business with his stepfather. He is a father of three, with one child having been born after the accident.

Knickerbocker's job was physically demanding. It included lifting, squatting, carrying and using heavy equipment, and carrying heavy bundles of wood flooring, oftentimes up several flights of stairs. He worked 40 to 50 hours per week for $13 per hour. Outside of work, he exercised and enjoyed time with his family, including running and using the trampoline with his daughters. He had no existing physical issues or limitations.

The motor vehicle accident on December 3, 2017 changed that. Knickerbocker estimated that he was traveling at approximately 25 to 30 mph when he was hit by the front of a USPS mail truck driven by Nelson. At the scene, he was immediately hurting, afraid, and scared. Due to his injuries, he could not stand up and walk. Medical personnel arrived and he was transported by helicopter to Midtown Medical Clinic in Columbus, Georgia on account of his condition as assessed on the scene.

At the hospital, he was diagnosed with a dislocated hip and broken radius in his right arm, for which he received closed reduction procedures.  He was released from the hospital the next day with orders to use aspirin, naproxen, and hydrocodone for his pain.

Over the next 6 weeks, Knickerbocker made several follow up visits to The Hughston Clinic, a local medical care provider.  He last visited The Hughston Clinic on February 27, 2018, nearly five years ago, where it was noted that he was doing well, had no significant pain in his hip, and did not require any medication, but that he still complained of stiffness in his right wrist and some numbness over his knee.  He was released to return to work on February 28, 2018, full duty and with no restrictions.  The Hughston Clinic asked him to return for a follow up visit in six months for assessment for possible osteonecrosis.  Knickerbocker did not return as directed.

Due to his injuries and pain, Knickerbocker remained out of work for approximately eight weeks.  Because he had a family to support and bills to pay, Knickerbocker returned to work.  However, he could not function in the job as he could pre-accident.  He testified that he could not get up and down as he formerly could, could not squat, and still suffered from pain and numbness.  On numerous occasions, his leg would lock up and he would stumble.

After a visit to a physician in October 2019, nearly two years after the accident, Knickerbocker participated in several physical therapy sessions, primarily for hip pain. At the time, the therapist noted his hip pain as ranging from four to seven on a scale of ten. The therapist noted problems with decreased range of motion, decreased flexibility, decreased joint mobility, decreased muscle strength, increased pain, and hypertonicity. Knickerbocker nevertheless quit attending physical therapy because, as he testified, his condition was not improving.

Knickerbocker testified that due to physical difficulties with performing the flooring job, he changed jobs and began working for a landscape company where he primarily operated equipment. He was later let go because his employer thought he was a liability due to his physical condition. Knickerbocker then returned to the flooring business.

In October 2021, Knickerbocker was examined by Dr. Keith Anderson, a physiatrist, for an independent medical examination. During the visit, Knickerbocker reported that he had not seen a doctor for several years, was still suffering from dull, aching hip pain, that he was never pain free and rated to a four to five on the zero-to-ten pain scale, that he suffered from numbness and tingling on his right side, and that he had some right wrist pain with intermittent numbness and tingling, but that he did not have problems sleeping at night.

On January 5, 2022, Knickerbocker visited an orthopedic physician group in North Alabama. At the time, he complained of increased pain from the lower back radiating down to his foot and ankle, with tingling and burning. During the visit, Knickerbocker confirmed that he had been working in the flooring business full duty and that he had not been taking anything for the pain. The examining doctor diagnosed low back pain and sciatica, but he did not think Knickerbocker needed any treatment for his hip dislocation.

Knickerbocker testified that he has recently taken a job with a construction company in Opelika, Alabama as an equipment operator, where his income is higher. This job is much less physically demanding than the flooring job.

His injuries have also impacted his family life. He cannot play with his children as he formerly could, such as running, jumping, swinging, and hiking. He described recent difficulty with pain that required him to stop on several occasions during Halloween trick-or-treating with his family. He also described his inability to assist his mother with activities around her house, activities which his brother and cousin now had to perform.

He describes his current pain as chronic, now having suffered from it for nearly five years. It has impacted his emotional well-being, including frustration, crying, and depression. He also describes difficulty with sleeping and with his sex-life, although he acknowledged having fathered a child since the accident. He cannot

sit still for long periods of time and must look for particular types of chairs with backs and armrests in order to maximize his comfortability.

This Court also observed Knickerbocker during the trial. Knickerbocker walked with a noticeable limp and grimace, and he also remained very squirmy in the witness box and at counsel table.

Knickerbocker acknowledges that he has had minimal medical treatment since his initial hospitalization in December 2017, and his current course of treatment involves conservative treatment such as massages, Icy Hot cream, salt baths, and the occasional use of over-the-counter medication. He attributes his minimal medical treatment to his lack of health insurance and insufficient funds to pay for doctor visits due to his family financial responsibilities. He acknowledges that he initially participated in physical therapy, but he quit going because he had family duties to attend to and because the physical therapy was no longer helping. He also acknowledges that he has attempted to play with his kids, including a few moments on the trampoline, and that he has helped fix-up go-carts, including racing one on one occasion.

## II. DAMAGES

Knickerbocker seeks several categories of damages in this action, acknowledging that he can obtain no more than $650,000 total, since this was the amount in his prior administrative demand. In his post-trial brief, he seeks $650,000

8

in compensatory damages. Some of the individual damages are contested by the United States, some are not. The United States in its post-trial brief argues that Knickerbocker is entitled to no more than $118,719.11, most of which is attributable to out-of-pocket, accrued and incurred medical expenses. The Court begins with those damages that are not contested, and then discusses those that are contested.

### A. Past Medical Expenses

Knickerbocker seeks $73,444.09 for accrued medical expenses. (Pl. Exs. 37–43; Def. Exs. 16–25) [Doc. 82 at 3; Doc. 64 at 4.] This amount is not contested by the United States other than a comment that it is inflated because, had Knickerbocker had health insurance as required by law, the medical bill amount would be substantially less due to contractual write-downs. Whether he did or did not have health insurance, the medical expenses were in fact incurred, and Knickerbocker is responsible for them. The Court concludes that since the full sum is due, owing, and recoverable and since the parties stipulate to this amount, **$73,444.09** will be awarded.

### B. Lost Wages

Knickerbocker seeks lost wages for his eight weeks away from work at $13 per hour. (Pl. Ex. 68; Def. Ex. 2.) Knickerbocker estimates this figure to be in the range of $4,680–5,200. The United States does not contest this figure, and in fact

stipulates to the $5,200 figure. [Doc. 82 at 3; Doc. 64 at 4.] Accordingly, lost wages in the amount of **$5,200** will be awarded.

### C. Damage to the Motorcycle

Knickerbocker's motorcycle was severely damaged to the tune of, at a minimum, $4,583 in estimated repair costs. (Pl. Ex. 67; Def. Ex. 4) [Doc. 82 at 3; Doc. 64 at 4.] Knickerbocker testified that he purchased the motorcycle approximately two years prior for $7,616.89 and that, in his opinion, the motorcycle had the same value at the time of the accident and was a total loss because of the accident. (Pl. Ex. 67; Def. Ex. 3.) A review of the purchase invoice for the motorcycle shows that Knickerbocker actually paid $6,995 for the motorcycle itself, when taxes and freight are excluded. (Pl. Ex. 67; Def. Ex. 3.) Since the time of the accident, the motorcycle has apparently been repossessed, but then returned to him. No competent evidence was provided as to the current ownership of the motorcycle. Knickerbocker seeks the entire original purchase price for the motorcycle, while the United States claims the cost to repair is the appropriate measure of damages.

The Court awards Knickerbocker **$5,982** on this item of damages. This sum includes the cost to repair the motorcycle, as well as the Court's estimate that the value of the repaired motorcycle will have diminished 20% from the base purchase price of $6,995 due to its involvement in the accident.

### D. Pain & Suffering, Mental Anguish, Physical Disability, and Disfigurement

Knickerbocker seeks an extensive amount of money ($204,780 to $273,040) in damages for past and future physical pain and suffering, a sum stemming from a daily value of $300 to $400 per month over Knickerbocker's life expectancy of 682.60 months. [Doc. 55 at 18.] He also seeks $68,260 to $102,390 for mental anguish, valued at $100 to $150 per month over his life expectancy, $102,390 to $136,520 for physical disability, and $136,520 to $170,650 for physical disfigurement. [*Id.*] Finally, he seeks $68,260 to $102,390 for loss of enjoyment of life. [*Id.*]

The United States does not dispute that damages for pain and suffering and mental anguish are due to be awarded; it only disputes the amount, arguing that no more than $30,000 should be awarded. [Doc. 93 at 5.]

Both parties reference verdicts in other motor vehicle accident cases, ranging from lower verdicts cited by the United States to larger verdicts cited by Knickerbocker. [*See generally* Docs. 82, 84.] The Court finds these verdicts without any relevance to this case, as each action for tort damages must proceed on its own distinctive facts and evidence.

Here, the testimony and evidence confirm a semi-serious motor vehicle accident in which Knickerbocker was injured and transported from the scene by helicopter and hospitalized for one day, with limited follow up medical visits and

limited physical therapy. Fortunately for Knickerbocker, the accident was not as severe as it could have been; after all, he was driving a motorcycle that collided with another vehicle. Knickerbocker provided testimony concerning his nearly five-year battle with the pain associated with the accident. His testimony also confirms that the pain has not been so debilitating that it required extensive follow up treatment, pain management, or care, or that it substantially altered his life activities. His testimony does confirm though that he has suffered pain, that it has impacted his personal life, his work life, and his general ability to go about his daily activities, and that he will have some degree of permanent impairment with it. The Court finds his testimony on these subjects credible.

Based on the evidence and after careful consideration of these factors, the Court awards a general sum of **$175,000** for past, present, and future pain and suffering, mental anguish, physical disability, and disfigurement. *See Handley v. United States*, No. 5:17-CV-01278-HNJ, 2021 WL 2023057, at *42 (N.D. Ala. Mar. 18, 2021), *appeal dismissed*, No. 21-12899-CC, 2022 WL 3588965 (11th Cir. July 15, 2022) (under Alabama law, "[t]he trier of fact determines the amount of damages to be awarded for pain, suffering and mental anguish in light of all the relevant circumstances" (quotation and citation omitted)).

### E. Future Surgery and Medical Care

Knickerbocker seeks the cost of future medical care, primarily focusing on future hip replacement surgery to resolve avascular necrosis—the same injury that tanked Bo Jackson's illustrious football career. In his testimony, Dr. Anderson testified that Knickerbocker has a good chance of developing post-traumatic arthritis and that it is more likely than not that he will suffer from avascular necrosis in the future. The parties disagree as to the cost of future hip surgery, with Knickerbocker estimating $17,781 and the United States estimating $11,674.39. (Pl. Ex. 69; Def. Ex. 40.) Aside from the surgery, Knickerbocker also points to the related costs that would come with such a surgery and cites to those costs as incurred during his post-accident hospitalization as evidence of what those costs would be. The parties have provided little-to-no evidence as to what the *total* actual cost of that surgery would be if performed today, including surgery fees, anesthesia, hospital costs, and the like, nor any firm evidence of post-surgery physical therapy.

Given Dr. Anderson's testimony and the type of injury involved, the Court concludes that an award of $25,000 is appropriate for the future hip surgery. This includes the current estimated cost of the procedure and an additional amount necessary for other costs such as hospital fees and anesthesia. The Court also notes that the surgery would occur many years in the future and therefore the likely cost of the surgery would be significantly more than $25,000. However, no evidence was

13

provided as to what the future cost would be at the stage in life where Knickerbocker would likely have the operation, and therefore the Court awards a sum based on today's cost from the information contained in the record.

Knickerbocker also seeks the costs of physical therapy for the rest of his life expectancy. The Court declines to award damages on such an open-ended and unsubstantiated basis, especially since Knickerbocker testified that he quit attending physical therapy because it did not help him. However, as with any surgery, there will be a need for physical therapy, and as such, the Court finds that an award for 24 weeks of post-surgery physical therapy (48 sessions total) at $76 per session is appropriate. Accordingly, the Court awards **$3,648** for physical therapy.

The Court awards no other damages for pre- or post-surgery physical therapy. The Court also awards no further damages for future prescriptions or follow up medical care, as Knickerbocker has presented no credible evidence supporting such an award.

### F. Costs of Insurance

Knickerbocker also seeks as damages the cost of enrolling in health insurance. The Court declines to award the cost of health insurance. Insurance costs alone are not foreseeable or expected expenses stemming from a motor vehicle accident. And further, the Court finds that it is far too speculative and conjectural to award

Knickerbocker the cost of insurance premiums for life, since he could at any moment procure a job that offers health insurance as a benefit.

### G. Total Damages Awarded

In sum, the Court finds that Knickerbocker is entitled to a total damages award as follows:

| | |
|---|---|
| Past Medical Expenses: | $73,444 |
| Lost Wages: | $5,200 |
| Damage to Motorcycle: | $5,982 |
| Future Medical Care: | $28,648 |
| Pain & Suffering, Mental Anguish, Loss of Enjoyment, Disability & Disfigurement: | $175,000 |
| **Total:** | **$288,274** |

## III. CONCLUSION

Accordingly, it is **ORDERED** as follows**:**

The Clerk of the Court is **directed** to enter **JUDGMENT** in favor of Plaintiff Michael Ryan Knickerbocker and against the Defendant in the total amount of **$288,274.00**. Costs are taxed against the Defendant. The Clerk is further directed to terminate all pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** this the 6th day of January, 2023.

/s/ R. Austin Huffaker, Jr.
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE